**STATE OF NEBRASKA,
Plaintiff–Appellant,**

The National Wildlife Federation; Nebraska Wildlife Federation; National Audubon Society, Plaintiffs–Appellees,

Powder River Basin Resource Council; Laramie River Conservation Council, Intervenors,

v.

**RURAL ELECTRIFICATION ADMINISTRATION; David A. Hamil, Administrator of the Rural Electrification Administration; Frank Bennett, Director, North Central Area–Electric, for the Rural Electrification Administration, Defendants–Appellees,**

Basin Electric Power Cooperative; Tri–State Generation & Transmission Assn., Inc.; Chimney Rock Public Power District; The Midwest Electric Membership Corp.; Panhandle Rural Electric Membership Assn.; Wheat Belt Public Power District; NW Rural Public Power District; City of Lincoln, Intervenors,

Platte River Whooping Crane Maintenance Trust, Intervenor–Appellee.

**STATE OF NEBRASKA,
Plaintiff–Appellant,**

The National Wildlife Federation; Nebraska Wildlife Federation; National Audubon Society, Plaintiffs–Appellees,

v.

James W. RAY, in his official capacity as District Engineer, Omaha District; U.S. Army Corps of Engineers; Basin Electric Power Cooperative, Inc., Defendants–Appellees,

Platte River Whooping Crane Maintenance Trust, Intervenor–Appellee.

No. 93–2084.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 13, 1993.

Decided May 4, 1994.

---

**3.** It is unnecessary for us to address the appellants' further contentions of error.

Counsel who presented argument on behalf of the appellant was L. Steven Grasz, Deputy Atty. Gen., of Lincoln, NE.

Counsel who presented argument on behalf of the appellee were Mark L. Laughlin of Omaha, NE, for Platte River Whooping Crane Maintenance Trust, and Christopher H. Meyer of Boise, ID, for the Nat. Wildlife Federation.

Before WOLLMAN, Circuit Judge, HEANEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

HEANEY, Senior Circuit Judge.

The State of Nebraska petitioned the district court to limit the participation of the Platte River Whooping Crane Maintenance Trust in various environmental litigation. The district court denied the petition, finding that the Trustees were acting within the scope of their authority under the trust instrument. We affirm.

The Platte River Whooping Crane Maintenance Trust was established pursuant to a 1978 settlement agreement following litigation between the State of Nebraska and the Basin Electric Power Cooperative of Bismarck, North Dakota, the project manager of

the Missouri Basin Power Project.[1] The purpose of the Trust is to "financ[e] programs, activities, and acquisitions to protect and maintain the migratory bird habitat in the so-called Big Bend area of the Platte River between Overton and Chapman, Nebraska." Trust Declaration, § II. Such "programs, activities, and acquisitions ... shall be formulated to protect and maintain, consistent with the provisions hereof, the physical, hydrological, and biological integrity of the Big Bend area so that it may continue to function as a life-support system for the whooping crane and other migratory species which utilize it." *Id.* The Trust now has title to 7,000 acres of Platte River riverbed and riparian land and conservation easements over an additional 1,600 acres.

The Trust is administered by three Trustees, one each designated by the Missouri Basin Power Project, the Governor of Nebraska, and the National Wildlife Federation. Each Trustee may be removed at any time by the organization or person who designated him or her. *Id.* § III. The Trustees must establish and implement a written habitat monitoring plan and regularly distribute monitoring reports to the public. *Id.* § IV(A)(1). Other "projects and activities which the Trustee may fund include, but are not limited to, management of the critical crane habitat, the acquisition of land or interests in land, the conduct of scientific studies of Whooping Cranes and of critical crane habitat on the Platte River, as well as the acquisition of all types of rights in or to water or water storage." *Id.*

Among the operational prohibitions of the Trust is the directive that "[n]o substantial part of the activities of this Trust shall be the carrying on of propaganda, or otherwise attempting to influence legislation. No part of the activities of the Trust shall be the partic-

ipation in, or intervention in (including the publication or distribution of statements) any political campaign on behalf of any candidate for public office, or in any litigation other than litigation directly related to the administration of the Trust." *Id.* § IV(C)(2).

In 1992 two corn growers associations wrote letters to the Nebraska Governor alleging possible violations of the Trust Declaration, including impermissible litigation and lobbying. After hearing the Trust's response and investigating the matter, the Attorney General of Nebraska found no violation of the prohibition on lobbying activities. The Attorney General concluded, however, that the Trust's intervention in Federal Energy Regulatory Commission (FERC) relicensing proceedings for Kingsley Dam (FERC Project No. 1417) and its participation in *Nebraska v. Wyoming*[2] violated the Trust Declaration and should cease immediately. The State also objected to the Trust's intervention in relicensing proceedings for the North Platte/Keystone Diversion Dam Project (FERC Project No. 1835). In response to the Trust's continued involvement in the FERC and *Nebraska v. Wyoming* proceedings, the State filed a petition in district court requesting an interpretation of the Trust Declaration that would prohibit the Trust from participating in those proceedings. The State now appeals the denial of that petition.

Resolution of this dispute requires an interpretation of the Trust Declaration in light of Nebraska law, which governs this trust instrument. *See* Trust Declaration, § X. We review de novo the district court's determination that the Trustees did not exceed the scope of their powers under the trust instrument and Nebraska law. *See In re Trust of Criss*, 213 Neb. 379, 329 N.W.2d 842,

---

1. That litigation was commenced by the State of Nebraska to stop construction of the Grayrocks Dam and Reservoir on the Laramie River in Wyoming, which was designed to supply water to the Missouri Basin Power Project. The State and several intervening environmental groups sought to halt construction until the project complied with federal environmental laws. The resulting settlement agreement and establishment of the Trust, approved by this court and Congress, allowed an exemption to the Endangered

Species Act and permitted construction on the dam and reservoir to proceed.

2. In 1986 Nebraska petitioned the United States Supreme Court to reopen *Nebraska v. Wyoming*, 325 U.S. 589, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945), *modified*, 345 U.S. 981, 73 S.Ct. 1041, 97 L.Ed. 1394 (1953), and enforce the North Platte Decree entered in that case. In 1987 the Trust's motion to intervene was denied, but the Trust was allowed to participate as an amicus curiae.

**1339**

848 (1983) (construing de novo a trust instrument). We thus take a fresh look at whether the Trust's involvement in litigation was proper under the Trust Declaration.

The State of Nebraska asserts that the Trust's participation in the FERC proceedings and *Nebraska v. Wyoming* violates the Trust Declaration's prohibition on litigation that is not "directly related to the administration of the Trust." Although the State suggested in its brief that this clause should be construed to permit only litigation involving the internal workings of the Trust, at oral argument the State conceded that the clause necessarily permits litigation directly affecting the powers and duties of the Trustees—but not the broad purposes of the Trust.

■ The Trustees' powers and duties are defined to include the following:

> The projects and activities which the Trustee may fund include, but are not limited to, management of the critical crane habitat, the acquisition of land or interests in land, the conduct of scientific studies of Whooping Cranes and of critical crane habitat on the Platte River, as well as the acquisition of all types of rights in or to water or water storage.

Trust Declaration, § IV(A)(1). Acting pursuant to these powers, the Trustees have acquired land and undertaken habitat studies and management activities in the Big Bend area. Thus, the State concedes, as it must, that litigation seeking to *preserve* water flows into the Big Bend habitat is "directly related to the administration of the Trust." The State argues, however, that the Trustees are impermissibly seeking to *enhance* water flows by engaging in "aggressive, policy-oriented litigation." Like the district court, we conclude this is a distinction without a difference. In our view, participation in litigation that bears directly on the supply of water flowing to the critical crane habitat is within the powers and duties of the Trustees and directly related to the administration of the Trust.

■ We first examine the nature of the Trust's involvement in the two FERC relicensing proceedings. The fifty-year licenses

for projects 1417 and 1835 were due to expire in 1987. In 1984 the operators submitted relicense applications to FERC, which found them deficient. *Platte River Whooping Crane Critical Habitat Maintenance Trust v. FERC,* 876 F.2d 109, 111 (D.C.Cir.1989). Upon expiration in 1987, the two projects were able to receive interim annual licenses to operate pending completion of the formal relicensing process. *See generally* 16 U.S.C. § 808(a). In May 1987 the Trust petitioned FERC to impose environmental protection conditions on those annual licenses. *Platte River Whooping Crane,* 876 F.2d at 112.

The district court found that the Trust's participation in the FERC proceedings was designed to persuade FERC to impose conditions on the interim annual licenses of the two hydroelectric projects to bring their operations into compliance with federal environmental laws, including the Endangered Species Act and the Migratory Bird Treaty Act, in order to secure adequate stream flows into the Big Bend area of the Platte River. *Nebraska v. REA,* Nos. CV76–L–242, CV78–L–90, slip op. at 4, 1993 WL 662353 (Mar. 23, 1993). We agree.

The Trust traces its interest in the two FERC relicensing proceedings to the loss of migratory bird habitat due to the operation of the dams. *See* Affidavit of John G. VanDerwalker, ¶ 9 (Dec. 23, 1992). It states that the power districts' practice of not allowing water to pass the dams at various times during the irrigation and non-irrigation seasons has led to the de-watering of portions of the Platte River and "is a principal cause of the degradation of the Platte River migratory bird habitat that has occurred over the last fifty-five years." *Id.* That the critical habitat of the whooping crane was the focus of the Trust's concern is further evidenced by the opinion in *Platte River Whooping Crane, supra,* which addressed the Trust's appeal of FERC's actions in the interim licensing proceedings. That decision contains an extensive and specific discussion of existing and potential harm to the whooping crane habitat from the operations of hydroelectric projects 1417 and 1835. As a result of the Trust's petition, FERC concluded that interim measures, including minimum instream

flows, were necessary to prevent irreversible damage to the habitat pending formal relicensing of the hydroelectric projects. 50 F.E.R.C. ¶ 61,180 (1990). These activities by the Trust clearly relate to the critical habitat of the Big Bend area of the Platte River.

■ We likewise agree with the district court that the positions taken by the Trust as amicus curiae in *Nebraska v. Wyoming* "have been limited to issues that directly relate to the integrity of the Big Bend Area in Nebraska." *Nebraska v. REA,* slip op. at 4. Although the overall scope of that litigation is broad, involving the allocation of water rights among Nebraska, Wyoming, and Colorado, the record before us shows that the Trust's focus has been on preserving the Big Bend habitat. The Trust's interest in the litigation is that the ultimate distribution of water among the states not adversely affect the habitat.

The State points to the Special Master's refusal to allow the Trust a more active role in that litigation as strong evidence that the Trust's participation was not directly related to its mandate under the trust instrument. We disagree. The Special Master identified the Trust's interest as "concern over the need for river flows in the critical wildlife habitat areas in the Big Bend Reach of central Nebraska downstream of the Tri–State Dam" and noted that the Trust "urge[s] relief in these proceedings to protect that habitat and the wildlife that is dependent on it." Special Master, *Nebraska v. Wyoming,* Second Interim Report, Hearing Draft, at 127 (Feb. 20, 1992). These concerns directly relate to the central purpose of the Trust.

The State also highlights a statement by the Special Master that there is no need to "sweep[ ] into these proceedings the implementation and enforcement of all federal environmental laws," *id.* at 131, because other forums exist for the Trust to present its concerns about water flows within Nebraska. The State apparently cites the quoted passage to support its contention that the Trust is acting as a general environmental advocacy group seeking to litigate a wide variety of federal environmental issues. The context of the statement does not support the State's broad assertion, however. That section of

the Special Master's report simply emphasizes that the *Nebraska v. Wyoming* litigation was focused on allocation of water among the states and that "other forums for environmental claims . . . are more suitable than [the Supreme Court] acting in an original jurisdiction case." *Id.* at 130. The Special Master's statement is properly viewed as a comment on the scope of the litigation before him. It adds nothing to the inquiry of whether the Trust's efforts to secure enforcement of a particular environmental law, whatever the forum, are directly related to its mandate under the Trust Declaration.

The record does not support the State's assertions that the Trust has squandered its resources on litigating public policy issues that exceed its authority. We conclude that the Trust Declaration's authorization of litigation "directly related to the administration of the Trust" encompasses the Trust's participation in the FERC proceedings and *Nebraska v. Wyoming.* The Trust's involvement in those proceedings has been properly restricted to the goal of preserving the migratory bird habitat in the Big Bend area of the Platte River. The evidence shows that the key to preserving the Big Bend habitat is protecting the water flows into that habitat. *See* Affidavit of Paul J. Currier, ¶¶ 9, 11, 12 (Dec. 23, 1992). We interpret section IV(C)(2) to permit litigation directed toward maintaining adequate water flows into the whooping crane habitat of the Big Bend area of the Platte River, thereby preserving the vitality of the habitat.

■ The State suggests that the Trust's litigation authority in the area of instream flows is limited to replacing the approximately 23,000 acre feet of water lost to the Grayrocks hydroelectric project, which was the subject of the litigation that gave rise to the settlement agreement from which the Trust was created. While it is true that section I of the Trust Declaration states that the Trust was established "to ensure that the operation of the Grayrocks Dam and Reservoir does not jeopardize the continued existence of the endangered Whooping Crane," it is equally true that the language setting forth the purpose of the Trust, the required and suggested projects, and the restrictions on litigation

is in no way limited to mitigating the impact of the Grayrocks operation. Moreover, the Trust's purpose of protecting and maintaining the "physical, hydrological, and biological integrity of the Big Bend area so that it may continue to function as a life-support system for the whooping crane and other migratory species which utilize it" would be thwarted were we to read the trust instrument to prohibit the Trust from participating in litigation concerning actual or potential water loss to the habitat attributable to sources other than the Grayrocks Dam and Reservoir. As we read the Trust Declaration, it clearly authorizes the Trustees to counteract through litigation the depletion and degradation of the critical habitat whether or not that depletion is traceable to the Grayrocks project.

As a corollary to its argument that the Trust is limited to mitigating the effects of Grayrocks, the State asserts that the Trust Declaration only allows the Trust to acquire water rights through purchases, not through litigation. It cites section IV(A)(2) to support this assertion. That provision, however, addresses the manner in which the Trustees may handle the initial principal of the Trust. It states that instead of investing the entire $7.5 million, the Trustees may use some of the principal to purchase land or interests in water or water storage. The provision simply imposes restrictions on the Trustees' ability to invade the trust principal. It says nothing about the scope of their authority to engage in litigation.

The State also argues that the Trust may not litigate against a position taken by the State, because the Trust Declaration requires the Trust to operate exclusively in connection with the State's purposes. *See* Trust Declaration, § II. In fact, that section of the trust instrument is more accurately described as reflecting the multi-party character of the Trust. It states that the "purpose of this Trust shall be to operate exclusively in connection with the carrying out of certain purposes of the State of Nebraska *and* the National Wildlife Federation" by financing programs and acquisitions to protect and maintain the Big Bend habitat (emphasis added). Although the three Trustees

must "consult with the State of Nebraska Game and Parks Commission" as well as the United States Fish and Wildlife Service when deciding which activities to pursue, *id.* § IV(A)(1), the State's only remedy when it disagrees with the Trustees' discretionary decisions is to remove its appointed Trustee, *see id.* § III.

We conclude that the Trust's participation in the FERC proceedings and *Nebraska v. Wyoming* is authorized by the Trust Declaration, and we therefore affirm the decision of the district court.